# EXHIBIT "A"

1  LYNN M. DEAN (Cal. Bar No. 205562)
   Email: deanl@sec.gov
2  MATTHEW T. MONTGOMERY (Cal. Bar No. 260149)
   Email: montgomerym@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Alka N. Patel, Associate Regional Director
   Amy J. Longo, Regional Trial Counsel
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
8

9                    **UNITED STATES DISTRICT COURT**

10                       **DISTRICT OF NEVADA**

11

12
   SECURITIES AND EXCHANGE                    Case No. 2:19-cv-01515
13 COMMISSION,
                                              **COMPLAINT**
14              Plaintiff,

15       vs.

16 JOHN F. THOMAS [aka JOHN
17 RODGERS, JONATHAN WEST,
   JOHN FRANK, and JOHN
18 MARSHALL], THOMAS BECKER,
   DOUGLAS MARTIN, PAUL
19 HANSON, DAMIAN OSTERTAG,
   EINSTEIN SPORTS ADVISORY,
20 LLC, QSA, LLC,
   VEGAS BASKETBALL CLUB, LLC,
21 VEGAS FOOTBALL CLUB, LLC,
   WELLINGTON SPORTS CLUB,
22 LLC, WELSCORP, INC., and
   EXECUTIVE FINANCIAL
23 SERVICES, INC.

24              Defendants.

25

26

27

28

EXHIBIT "A"

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.  The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.  Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Thomas and Becker reside in this district, and Defendants Einstein Sports Advisory, LLC ("ESA"), QSA, LLC ("QSA"), Vegas Basketball Club, LLC ("VBC"), Vegas Football Club, LLC ("VFC"), Wellington Sports Club, LLC ("Wellington"), and Welscorp, Inc. ("Welscorp") are domiciled in this district.

## SUMMARY

4.  This action concerns an ongoing, $29.5 million offering fraud by Defendants John F. Thomas ("Thomas") and Thomas Becker ("Becker")—both convicted felons— and their six entities, Defendants Wellington, Welscorp, ESA, QSA, VBC and VFC (the "Six Entities").

5.  Since August 4, 2014, Defendants have enticed over 600 investors nationwide to invest in the Six Entities on the promise that they will make 250% to 600% returns from a pooled investor fund used to bet on sporting events.  Defendants

claim to have a proprietary handicapping system, and they tell investors that investing with them is a "low-risk way to TRIPLE your funds in less than 6 months." These representations are patently false.

6.      Contrary to Defendants' representations to investors, the Six Entities do little actual sports betting. Instead, the Defendants misappropriated the majority of the money raised from investors, which they used to fund Thomas and Becker's lifestyles, pay commissions to brokers and agents, or make Ponzi payments.

7.      Investors are solicited through a network of over 150 brokers and agents. The largest producing brokers and agents selling the offerings are Defendant Douglas Martin ("Martin") and his entity defendant Executive Financial Services, Inc. ("EFS"), along with defendants Paul Hanson ("Hanson"), and Damian Ostertag ("Ostertag"). From 2016 through the present, Martin and EFS have earned commissions of at least $458,000, Hanson has earned $281,000 in commissions, and Ostertag has earned $414,000 in commissions.

8.      None of the offerings in the Six Entities is registered with the SEC, and none of the salespeople are registered brokers or associated with a registered broker.

9.      By their conduct, Thomas, Becker, ESA, QSA, VBC, VFC, Wellington, and Welscorp violated Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Defendants Martin, Hanson, Ostertag, and EFS violated Sections 5(a) and 5(c) of the Securities Act and Section 15(a) of the Exchange Act.

10.      The SEC seeks preliminary and permanent injunctions against future violations of Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder as to Thomas, Becker, ESA, QSA, VBC, VFC, Wellington, and Welscorp; permanent injunctions against future violations of Sections 5(a) and 5(c) of the Securities Act and Section 15(a) of the Exchange Act as to Martin, Hanson, Ostertag, and EFS; conduct-based injunctions against Thomas and Becker, permanently enjoining each from participating in the

1  issuance, purchase, offer, or sale of any security in an unregistered offering;
2  disgorgement with prejudgment interest; and civil penalties against all Defendants.

3  **THE DEFENDANTS**

4      11.  **John Thomas**, a/k/a, John Rodgers, Johnathan West, John Frank, and
5  John Marshall, age 74, resides in Henderson, Nevada.  Thomas is not registered with
6  the Commission in any capacity.  Thomas is the Managing Member of defendants
7  VBC and VFC, the Managing Partner of defendant Wellington and the Managing
8  Director of defendant Welscorp.  In 1991, Thomas, known at the time as John
9  Rodgers, pled guilty to federal felony charges of money laundering and conspiracy
10  arising from a pyramid scheme he ran with Thomas Becker.   That plea agreement
11  and conviction were upheld on appeal, *U.S. v. Rodgers,* 101 F.3d 247 (2d Cir. 1996).

12      12.  **Thomas Becker**, age 72, resides in Henderson, Nevada.  Becker is not
13  registered with the Commission in any capacity.  Becker is the Managing Member of
14  defendants QSA and ESA, and the President and CEO of defendant Welscorp.  In
15  1991, Becker pled guilty to federal felony charges of money laundering and
16  conspiracy arising from a pyramid scheme he ran with John Thomas, noted above.

17      13.  **Douglas Martin**, age 63, resides in Pembroke Pines, Florida.  Martin is
18  not registered with the Commission in any capacity.  Martin held a variable annuity
19  license through the late 1990s.  Martin is a broker for Wellington.

20      14.  **Paul Hanson**, age 90, resides in Fairfax, California.  Hanson is not
21  registered with the Commission in any capacity.  Hanson is a broker for  QSA.
22  Hanson passed the Series 1, Series 63 and Series 24 exams and was associated with
23  various registered broker-dealers from 1975 through the late 1990s.  In 1997, Hanson
24  was convicted of multiple felony charges of grand theft, embezzlement and false
25  statements in the purchase or sale of a security in Santa Cruz County.  In 2004, he
26  was barred by the NASD for failing to respond to a request for information
27  concerning compliance with an arbitration award against him related to fraud and
28  misrepresentation in the sale of "Viatical Notes."

15.     **Damian Ostertag**, age 45, resides in American Canyon, California. Ostertag is not registered with the SEC in any capacity. Ostertag is an agent for QSA. Ostertag passed the Series 7 and Series 63 exams.

16.     **Einstein Sports Advisory, LLC.** is a Nevada limited liability company formed on November 3, 2015. Its principal place of business is 440 Welpman Way, Henderson, Nevada 89044. ESA is not registered with the SEC in any capacity. Becker is the Managing Member of ESA.

17.     **QSA, LLC** is a Nevada limited liability company formed on June 29, 2016. Its principal place of business is 440 Welpman Way, Henderson, Nevada 89044. QSA is not registered with the SEC in any capacity. Becker is the Managing Member of QSA.

18.     **Vegas Basketball Club, LLC** is a Wyoming limited liability company formed on January 9, 2015. Its principal place of business is 440 Welpman Way, Henderson, Nevada 89044. VBC is not registered with the SEC in any capacity. Thomas is the Managing Member of VBC.

19.     **Vegas Football Club, LLC** is a Wyoming limited liability company formed on May 29, 2014. Its principal place of business is 440 Welpman Way, Henderson, Nevada 89044. VFC is not registered with the SEC in any capacity. Thomas is the Managing Member of VFC.

20.     **Wellington Sports Club, LLC** ("Wellington") is a Washington limited liability company formed on December 3, 2015. Its principal place of business is 440 Welpman Way, Henderson, Nevada 89044. Wellington is not registered with the Commission in any capacity. Thomas is the Managing Partner of Wellington. Becker is a Manager of Wellington.

21.     **Welscorp, Inc.** ("Welscorp") is a Nevada limited liability company formed on September 9, 2016. Its principal place of business is 440 Welpman Way, Henderson, Nevada 89044. Welscorp is not registered with the SEC in any capacity. Becker is the President and CEO of Welscorp. Thomas is the Managing Director of

1  Welscorp.

2      22.   **Executive Financial Services, Inc.** ("EFS") is a Florida corporation

3  formed on May 8, 2017.  Its principal place of business is 4581 Weston Road, Suite

4  344, Weston, Florida 33331.  It is not registered with the Commission in any

5  capacity.  Martin is its sole owner and serves as its president, treasurer, secretary, and

6  director.

7                          **THE ALLEGATIONS**

8      **A.**   **The Offering**

9      23.   From at least August 2014 through the present, Defendants have raised

10 at least $29.5 million from over 600 investors in more than 40 states, by offering

11 investors pooled investment contracts whereby they obtain the opportunity to share in

12 the purported profits generated from Thomas and Becker's proprietary sports betting

13 system.  Investors are enticed with the possibility of extraordinary returns.

14     24.   Defendants raised these funds by offering investments in the Six

15 Entities.  The Six Entities are used interchangeably: that is, regardless of the entity

16 the investor invests in, the terms of the investment are the same, and Thomas and

17 Becker disregard the corporate forms to transfer investor funds among the Six

18 Entities.  Each entity enters into a Sports Advisory Agreement (the "Investor

19 Agreement") with its respective investor.

20     25.   Thomas drafted the form used for the Investor Agreements, and Thomas

21 or Becker sign the Investor Agreements (Thomas often uses an alias) on behalf of the

22 Six Entities, sometimes regardless of whether they had an official position with the

23 contracting entity.  The investors also sign the Investor Agreements.

24     26.   The Investor Agreements provide that, "in consideration of [the specific

25 Entity's] development of a proprietary handicapping system that is highly accurate in

26 predicting the outcome" of sporting events, "INVESTOR has contracted [the specific

27 Entity] to manage INVESTOR's funds by making picks and placing bets on legal

28 domestic sportsbooks."  The Investor Agreements represent that the investor's cash

investment, called the "bankroll," will be invested in this manner until it grew by anywhere ranging from 500% to 1,200%, an amount described in the Investor Agreements as the "target." The Investor Agreements do not disclose any other use of investor funds.

27. The Investor Agreements limit the type of sporting events on which bets would be made. In addition, Thomas and Becker told many investors in text messages, emails, and conversations that their funds would be pooled with those of other investors when their bets would be made. Investors understand their investment funds would be pooled with those of other investors.

28. Investors in the Six Entities are told they will share in the profits generated by the purported sports betting. Under the terms of many versions of the Investor Agreements, once a specified investment target return was reached, the entity was obligated to give 50% of the target to the investor and could keep the remainder for itself.

29. Beginning in December 2017, Defendants began using a newer version of the Investor Agreement that stated that profits will be split after each betting day, rather than splitting the profits after an investment target return is reached.

### 1. Thomas and Becker's Role

30. Thomas and Becker run the day-to-day operations of the Six Entities.

31. Becker focuses his attention on dealing with the banks and speaking with investors and brokers.

32. Thomas focuses on analyzing sports games, but he also communicates regularly with investors and drafted the Investor Agreements. Thomas controls what checks the entities write.

33. Thomas and Becker are also heavily involved in the solicitation of investors. They drafted and provided marketing letters to the brokers and agents and encouraged them to use their entities' websites to solicit investors. They emailed form marketing letters to brokers and agents with explicit instructions for soliciting

investors. For example, in one email dated August 17, 2016, Thomas directed the broker/agents to "Just 'Forward' this email without this BLUE note to your Multi-Fold Contracts [another name for the Investor Agreements] prospects… personalizing only the salutation and the Subject line."

34.    In these email marketing letters, Thomas and Becker described "an extraordinary investment opportunity" and a "low-risk way to TRIPLE your funds in less than 6 months." They stated that the entities will "grow" the investors' funds to a predetermined target through sports betting and then "split" that amount between the investor and the Entity. Thomas and Becker also include their falsified historic rates of returns in the form marketing letters.

35.    Thomas and Becker provided agents and brokers with access to password-protected marketing websites with content that was identical to the content of the marketing letters. The brokers and agents could give investors access to the websites, where investors were able to review past performance data provided by Thomas and a webinar in which Thomas explains the betting strategies.

36.    On occasion, Thomas and Becker directly communicate with prospective and current investors. They do so through email, text messages, phone calls and in-person meetings. For example, on or about October 31, 2017, Thomas sent a text to a potential investor stating: "Great speaking with you. To find out more about how you can triple your funds in less than 12 months, just tap the link below," and then provided a link to an agent's website. In emails, Thomas told investors that he is able to "grow money 10-fold in 4 months" (or 1,000 percent returns in 4 months) which he claims means he can achieve rates of "a quadrillion-fold in 5 years, and a **QUINTILLION-FOLD** in 6 years" (emphasis in original).

37.    Thomas told at least one investor, on or about July 10, 2017, that "we grow money 10 times faster than Warren Buffet," and another, on or about November 14, 2018 "[w]e grow money a million times faster than Warren Buffet . . . actually we grow it a quadrillion times faster."

38.     Becker also told at least one potential investor, through an email dated January 25, 2017, that "[t]he King – Warren Buffet – takes more than 6 years to triple an investor's funds.  We triple money in less than 6 months."

39.     Thomas and Becker also provide prospective investors with access to their entities' password-protected websites, where the prospective investors viewed "demo" accounts that purported to show how fast an investment could grow.

40.     Some of the websites used by Defendants were:

> http://www.wellingtonsportsclub.com
>
> www.einsteinsportsadvisory.com
>
> www.quantumsportsadvisory.com
>
> www.einsteinsportsadvisory.com
>
> http://vegasfootballclub.com
>
> http://vegasbasketballclub.com

Defendants also maintained at least 40 websites that started with the domain roi.zone, including http://roi.zone/welcome.

**2.      The Role of Brokers and Agents**

41.     Investors are solicited through a network of over 150 brokers and agents who work for the brokers.  The Six Entities entered into Sports Investment Broker Agreements ("Broker Agreements") with these brokers, which either Thomas or Becker signed.  These Broker Agreements provide that the brokers receive a 10% front-end sales SEC and a 10% back-end commission based on payouts to their investors.  The agreements signed by brokers and agents state that they are not employees of the Six Entities.

42.     Some brokers brought on agents to solicit investors.  The agents signed Sports Investment Agent Agreements ("Agent Agreements") with the Six Entities, which Thomas or Becker also signed.  Under these Agent Agreements, the agent receives front-end and back-end commissions.  Brokers are also entitled to commissions based on investments brought in by their agents.  The agents do not deal

1   with Thomas and Becker directly; they are required to contact their broker before
2   contacting Thomas or Becker directly.

3       43.   There is no disclosure to investors regarding sales commissions. The
4   brokers and agents are told that their commissions will be paid from the profits of the
5   Six Entities. In a January 31, 2017 email, Thomas explained to one agent, "The deal
6   is that we split the Gross Profit with the Investor. [ . . . ] All our expenses and your
7   commission come out of our share." In fact, broker and agent commissions are paid
8   using investor funds.

9       **B.    The Fraud**

10          **1.    Misuse and Misappropriation of Investor Funds**

11      44.   Contrary to their representations to investors, Thomas, Becker, and the
12  Six Entities have only used a small portion of investor funds for sports betting. From
13  August 2014 to November 2018, the accounts in the name of Thomas, Becker and
14  their entities received a total of $31.1 million. Approximately $29.5 million of this
15  came from investors; only $1.6 million can be traced to other sources.

16      45.   During this same period, Thomas and Becker paid investors at least
17  $13.2 million in purported returns. Because at most $1.6 million of the total deposits
18  came from sources other than investors, at least $11.6 million of those investor
19  returns were paid with investor funds. Investors do not know their funds are going to
20  pay returns to other investors.

21      46.   In addition to making these Ponzi payments, Thomas and Becker are
22  misappropriating investor funds to cover their living expenses and expenses
23  associated with their businesses. Specifically, they spent at least $13.9 million on
24  personal and business expenses and commissions to the brokers and agents soliciting
25  investors ($8 million on personal and business expenses, and at least $5.8 million in
26  commissions).

27      47.   For example, Thomas and Becker used approximately $860,000 for
28  retail purchases, wellness products and utilities, and spent over $256,000 on food and

travel.

48.     Since they had no more than $1.6 million from sources other than investors, at least $12.3 million of the $13.9 million in expenses were paid with investor funds.

49.     Thomas and Becker spent more than 85% of the investor funds on something other than sports betting.  The following summarizes how the $31.1 million deposited into the relevant bank accounts ($29.5 million of which came from investors) was spent:

| | |
|---|---|
| Investor returns...................... | $13.2 million |
| Personal/business expenses... | $8 million |
| Broker and agent commissions........................... | $5.8 million |
| Possible sports betting........... | $4.4 million |
| Total funds received | $31.1 million |

50.     At most, $4.4 million of investor money, or about 15%, of the $29.5 million raised from investors, may have been used to make bets.

51.     Thomas, Becker, and the Six Entities acted with scienter in misusing investors funds.  Thomas and Becker knew, or were reckless in not knowing, how investor funds are being used because they have exclusive control over the bank accounts of the Six Entities.

52.     Since August 2014, Thomas, Becker, and their various companies (including the Six Entities) used at least 31 bank accounts.  Either Thomas or Becker is the sole signatory on each of those accounts.  Becker monitored the bank accounts daily to confirm the receipt of investor funds.

53.     Thus, Thomas and Becker knew, or were reckless in not knowing, that they were misappropriating investor funds for their own personal expenses and other undisclosed purposes, such as commissions and Ponzi payments.

54.     In addition, Thomas, Becker, and the Six Entities failed to exercise

reasonable care by, among other things, misappropriating and misusing investor funds, and thus were negligent.

55.     Because Thomas and Becker control the Six Entities, their scienter can be attributed to them.

### 2.     False and Misleading Statements to Investors

56.     Thomas, Becker, and the Six Entities are making false and misleading statements to investors.  First, they falsely tell investors that their investments will be used for sports betting.  The Investor Agreements specifically say that Thomas, Becker, and the Six Entities will "manage [the] investor's funds by making picks and placing bets."  There are no provisions in the Investor Agreements indicating that investor money would be used to pay for anything else, including sales commissions or operating expenses.

57.     To date, Defendants have used, at most, only 15% of investor funds to bet on sporting events.  As set forth in detail above, the rest has been used to pay Thomas and Becker's personal expenses, make Ponzi payments, or to pay sales commissions or other business expenses of the Six Entities.

58.     Second, Thomas, Becker, and the Six Entities misrepresent the performance of the investment to both current and prospective investors.  Each investor is given access to a personalized spreadsheet maintained on the website of the entity the investor invested in.  The spreadsheets track each investor's account balance, which purports to increase or decrease based on the results of sports betting.  Thomas and Becker used an IT person to create the form of the spreadsheets but Thomas provides the data that is shown in the spreadsheets.

59.     Multiple investors reinvested because they were impressed with the rate of growth they saw on the spreadsheets.

60.     Though Thomas, Becker, and the Six Entities engage in some limited sports betting, the profits they include in the spreadsheets are false.  For example, on

February 11, 2017, the aggregated investor spreadsheets provided to investors showed that investor accounts increased by $5,344,262.  However, the betting slips evidencing the bets placed by the Six Entities on that day show they only earned $105,782.50 through sports betting.  Therefore, the spreadsheets provided to investors inflated the February 11, 2017 results by 5,052%.

61.    In a second example, on May 12, 2018, the aggregated investor spreadsheets show that the betting generated $60.5 million in profits, while the betting slips show only $119,536.40 in actual betting wins.

62.    As another example, although the bank accounts for the Six Entities held less than $1.8 million on any given day in June 2018, the individualized spreadsheets provided to investors indicate that the aggregate value of the investors' accounts was more than $275 million on June 16, 2018.

63.    Thomas and Becker also provide many prospective investors with access to the Six Entities' websites where they can see "demo" spreadsheets that purport to show how their money would grow if they had invested with one of the entities. These demo spreadsheets show the sample investment growing at the same falsified rate the actual investors see on their individualized spreadsheets for their actual investments.

64.    The false statements in these demo spreadsheets were important to investors when making the decision to invest because they made the investment appear far more profitable than it is.

### 3.    Thomas, Becker, and the Six Entities are Lulling Investors

65.    Thomas, Becker, and the Six Entities have lulled investors into believing their investments are performing as promised when they are not.  These Defendants falsely tell investors that they have earned large returns on their investments.

66.    In email and texts with investors, Thomas states that he has the cash needed to pay investors because he has earned large returns through sports betting. However, when an investor demands payment, Thomas and Becker often claim they

1  cannot pay the return for a host of reasons, and instead offer to make small monthly
2  payments.

3      67.    Thomas and Becker regularly tell investors they are unable to pay
4  investors because all of the winnings are in cash and they cannot deposit the cash into
5  bank accounts.  For example, in a December 6, 2017 email, Thomas falsely told an
6  investor that he could not pay her in cash because "our attorney, who was a former
7  US Attorney, says if we do that the government will likely charge us with: 1)
8  colluding with our investors to structure money; 2) colluding with our investors to
9  avoid reporting cash transactions; 3) colluding with our investors to avoid paying
10  taxes, and 4) money laundering.  Never mind that our investors might be charged as
11  well.  He says that we will start negotiating a plea agreement to avoid a 25-year
12  sentence."

13      68.    In addition, Thomas often encourages investors to reinvest, thereby
14  postponing the need to pay them their principal and purported returns.  The Investor
15  Agreements specifically state that investors may re-invest by executing "additional"
16  Investment Agreements, after the "target" is met.

17      **4.**    **Defendants' Misrepresentations are Material and**
18          **Made with Scienter**

19      69.    Defendants Thomas and Becker and the Six Entities' false and
20  misleading statements to investors are material.  A reasonable investor would have
21  considered it important to know that their funds were not being used to make sports
22  bets but were instead being used to pay Thomas and Becker's personal expenses, to
23  pay commissions, and make Ponzi payments.

24      70.    These Defendants acted with scienter.  Thomas and Becker knew, or
25  were reckless in not knowing, that the Six Entities had little sports betting activity.
26  They knew or were reckless in not knowing that they and their brokers and agents
27  were making false statements regarding prospective and actual investment returns.
28  Moreover, Thomas and Becker each controlled the bank accounts that received and

1  disbursed investor funds; thus, they knew, or were reckless in not knowing, that they

2  were misappropriating investor funds for their own personal expenses and other

3  undisclosed purposes, such as commissions and Ponzi payments.

4    71.    In addition, Thomas and Becker failed to exercise reasonable care by,

5  among other things, misappropriating investor funds and making materially

6  misleading representations, and thus were negligent.

7    72.    Because they controlled them, Thomas and Becker's scienter may be

8  attributed to the Six Entities.

9    **C.    The Defendants are Selling Unregistered Securities**

10    73.    None of the offerings for the Six Entities are registered with the SEC.

11  The offerings were part of a single plan of financing and for the same general

12  purposes, namely, to raise capital for sports betting.  In addition, all of the offerings

13  contained the same class of securities (investment contracts in the form of the

14  Agreements) and received the same form of consideration (cash).

15    75.    Thomas and Becker exercise common control over the Six Entities, and

16  disregard their corporate forms by using the Entities' funds as if they are their own.

17  In addition, all Six Entities are engaged in the same type of business, and Thomas and

18  Becker commingle assets among the Entities.

19    76.    The Six Entities, as the issuers, and Thomas and Becker, as their owners,

20  managers and officers, directly offered and sold investments through the Investor

21  Agreements.

22    77.    In addition, Thomas and Becker were necessary participants in the

23  offering because they managed and controlled the entities, and drafted and approved

24  the content of the Investor Agreements.

25    78.    Martin, Martin's entity EFS, Hanson and Ostertag each directly offered

26  and sold investments through the Agreements, and earned commissions from the

27  entities for the investments they sold.

28    79.    The Six Entities are liable for the registration violations because they

were the issuers of the investment contracts sold through the Investor Agreements.

80.    Thomas and Becker are liable under Section 5 of the Securities Act because they directly offered and sold investments through the Investor Agreements. In addition, Thomas and Becker were necessary participants in the offering because they managed and controlled the entities, hired the brokers, and drafted and approved the content of the marketing materials.

81.    Martin and his entity EFS, Hanson, and Ostertag are liable for the Section 5 violations because they communicated directly with potential investors by phone and email. They discussed the investment with potential investors, fielded investor questions, and encouraged potential investors to send funds.

82.    No exemptions to the registration requirements are available. First, the intrastate exemption under Section 3(a)(11) of the Securities Act, the Rule 147 safe harbor, and the Rule 147A exemption are not available because the securities were sold in at least 40 states.

83.    Second, none of the offerings meet the requirements of the private placement exemption under Section 4(a)(2) of the Securities Act because there were over 600 investors nationwide and investors also did not have access to the kind of information that registration would reveal, such as financial statements. Defendants do not provide prospective investors with the Six Entities' financial information. In fact, Thomas has told investors, agents, and brokers that the entities' financial information was confidential.

84.    Third, none of the offerings satisfied the safe harbor and exemptions provided by Regulation D. The integrated offerings raised at least $29.5 million from over 600 investors. Thus, the Rule 504 exemption is unavailable because the integrated offerings exceeded the $1 million maximum aggregate offering amount allowable under Rule 504.

85.    The Rule 505 exemption is not available because the integrated offerings

exceeded the $5 million maximum aggregate offering amount allowable.[1]  The Rule 505 exemption and Rule 506(b) safe harbor are not available because investors were not furnished with the information required by Rule 502(b), particularly financial statements including at least an audited balance sheet.  In addition, in order to rely on the Rule 506(c) exemption, all of the entities' investors had to be accredited, and they must have taken reasonable steps to verify accreditation.  Multiple investors were unaccredited and Defendants took no steps to determine whether investors were accredited.

86.    Defendants do not make any effort to determine whether investors are accredited.  None of the investors are questioned about their income or net worth before they invest.  Several investors are in fact unaccredited.

**D.    Martin, EFS, Hanson, and Ostertag Acted as Unregistered Broker-Dealers**

87.    Martin, EFS, Hanson, and Ostertag violated Section 15(a)(1) of the Exchange Act by acting as unregistered brokers for the Six Entities' offerings.  Martin and EFS, Hanson and Ostertag each directly offered and sold investments through the Agreements, and earned commissions from the entities for the investments they sold.

88.    The Six Entities have paid commissions to more than 150 brokers and agents.  Martin and his entity EFS, Hanson, and Ostertag are the highest paid brokers, earning commissions of at least $458,000, $281,000 and $414,000, respectively, from 2016 through the present.

89.    Martin, a life insurance agent, directed his life insurance clients to invest.  In August 2016, Martin entered into a Broker Agreement with Wellington that called for front-end commissions equal to 10% of any investments Martin brought to Wellington plus a back-end commission equal to 10% of any distributions

---

[1] The Rule 505 exemption was repealed effective May 23, 2017, but was in effect at the time of some of the offers and sales here.

Wellington paid on those investments. In October 2016, EFS entered into a Sports Investment Broker Agreement with Wellington that paid the same commissions. More than 25 people from at least two states invested in Wellington through Martin and EFS. In 2017 and 2018, 80% of Martin's annual income came from commissions from Wellington. Martin and EFS were not registered brokers, nor was Martin associated with a registered broker, at the time that they were selling the Six Entities' offerings.

90. In July 2016, Hanson signed a Broker Agreement with QSA. Hanson sold investments in QSA and managed 13 agents, including Ostertag. Hanson's Broker Agreement with QSA entitled him to 10% front-end and 10% back-end commissions. He also split the 10% commissions his agents earned for selling investments. Many of the agents Hanson recruited also recruited agents, and he split commission with those agents as well. He referred to his network of agents as a "brokerage." In total, Hanson earned more than $281,000 in commissions. Hanson was not a registered broker, nor was he associated with a registered broker, at the time that he was selling the Six Entities' offerings.

91. In July 2016, Ostertag signed an Agent Agreement with QSA, which allowed him to earn 5% front-end and 5% back-end commissions. Ostertag worked as an agent for Hanson. He also helped Hanson manage a network of 13 other agents who solicited investors. Ostertag was also entitled to the commissions earned by the agents he recruited. From July 2016 through October 2018, Ostertag brought in approximately 20 investors to QSA, many of whom were his friends and family. Ostertag received over $414,000 in commissions from QSA. Those commissions accounted for all of his income in 2017. Ostertag was not a registered broker, nor was he associated with a registered broker, at the time that he was selling the Six Entities' offerings.

**D.      Defendants' Conduct is Ongoing**

92. Defendants continue to offer investments to investors. They signed new

Agreements with investors as recently as May 2019 and received investor deposits in their bank accounts as recently as July 2019.

### FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against Thomas, Becker, ESA, QSA, VBC, VFC, Wellington, and Welscorp)**

93.    The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

94.    Thomas, Becker, and the Six Entities are making false and misleading statements to investors.  First, they falsely tell investors that their investments will be used for sports betting.  The Investor Agreements specifically say that Thomas, Becker, and the Six Entities will "manage [the] investor's funds by making picks and placing bets."  There are no provisions in the Investor Agreements indicting that investor money would be used to pay for anything else, including sales commissions or operating expenses.

95.    Second, Thomas, Becker, and the Six Entities misrepresent the performance of the investment to both current and prospective investors in personalized spreadsheets that purports to show an increase or decrease in the investor's account based on the results of sports betting.  The "profits" stated in the spreadsheets are false.  For example, on February 11, 2017, the aggregated investor spreadsheets provided to investors inflated the February 11, 2017 results by 5,052%.

96.    Despite their false representations to investors, Thomas, Becker, and the Six Entities have only used a small portion of investor funds for sports betting.  From August 2014 to November 2018, bank accounts in the name of Thomas, Becker and the Six Entities received approximately $29.5 million from investors.  During this same period, Thomas, Becker, and the Six Entities paid investors at least $13 million in purported investor returns using investor funds.

97.    In addition to making these Ponzi payments, Thomas and Becker are

misappropriating investor funds to cover their living and business expenses and undisclosed sales commissions. They spent at least $13.9 million of investors funds on personal and business expenses and commissions to the brokers and agents soliciting investors.

98. By engaging in the conduct described above, Defendants Thomas, Becker, ESA, QSA, VBC, VFC, Wellington, and Welscorp, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

99. By engaging in the conduct described above, Defendants Thomas, Becker, ESA, QSA, VBC, VFC, Wellington, and Welscorp each violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a) of the Securities Act

### (Against Thomas, Becker, ESA, QSA, VBC, VFC, Wellington, and Welscorp)

100. The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

101. Thomas, Becker, and the Six Entities are making false and misleading statements to investors. First, they falsely tell investors that their investments will be used for sports betting. The Investor Agreements specifically say that Thomas, Becker, and the Six Entities will "manage [the] investor's funds by making picks and

placing bets." There are no provisions in the Investor Agreements indicting that investor money would be used to pay for anything else, including sales commissions or operating expenses.

102. Second, Thomas, Becker, and the Six Entities misrepresent the performance of the investment to both current and prospective investors in personalized spreadsheets that purports to show an increase or decrease in the investor's account based on the results of sports betting. The "profits" stated in the spreadsheets are false. For example, on February 11, 2017, the aggregated investor spreadsheets provided to investors inflated the February 11, 2017 results by 5,052%.

103. Despite their false representations to investors, Thomas, Becker, and the Six Entities have only used a small portion of investor funds for sports betting. From August 2014 to November 2018, bank accounts in the name of Thomas, Becker and the Six Entities received approximately $29.5 million from investors. During this same period, Thomas, Becker, and the Six Entities paid investors at least $13 million in purported investor returns using investor funds.

104. In addition to making these Ponzi payments, Thomas and Becker are misappropriating investor funds to cover their living and business expenses and undisclosed sales commissions. They spent at least $13.9 million of investors funds on personal and business expenses and commissions to the brokers and agents soliciting investors.

105. By engaging in the conduct described above, Defendants Thomas, Becker, ESA, QSA, VBC, VFC, Wellington, and Welscorp, and each of them, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in

transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

106.  By engaging in the conduct described above, Defendants Thomas, Becker, ESA, QSA, VBC, VFC, Wellington, and Welscorp each violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a).

### THIRD CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(Against All Defendants)**

107.  The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

108.  None of the Six Entities offerings were registered with the SEC and no exemptions to the registration requirements are available.  The Six Entities, as the issuers, and Thomas and Becker, as their owners, managers and officers, directly offered and sold investments through the Investor Agreements.  In addition, Thomas and Becker were necessary participants in the offering because they managed and controlled the entities, and drafted and approved the content of the Investor Agreements.  Martin, EFS, Hanson and Ostertag each directly offered and sold investments through the Agreements, and earned commissions for the investments they sold.

109.  The Six Entities are liable for the registration violations because they were the issuers of the investment contracts sold through the Investor Agreements.

110.  Thomas and Becker are liable under Section 5 of the Securities Act because they directly offered and sold investments through the Investor Agreements. In addition, Thomas and Becker were necessary participants in the offering because they managed and controlled the entities, hired the brokers, and drafted and approved the content of the marketing materials.

111.   Martin, EFS, Hanson, and Ostertag are liable for the Section 5 violations because they communicated directly with potential investors by phone and email. They discussed the investment with potential investors, fielded investor questions, and encouraged potential investors to send funds.

112.   By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

113.   By engaging in the conduct described above, Defendants have each violated, and unless restrained and enjoined, will continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

## FOURTH CLAIM FOR RELIEF

### Unregistered Broker-Dealer

### Violation of Section 15(a) of the Exchange Act

### (against Defendants Martin, EFS, Hanson, and Ostertag)

114.   The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

115.   Martin, EFS, Hanson, and Ostertag acted as unregistered brokers for the Six Entities offerings.  Martin, EFS, Hanson and Ostertag each directly offered and sold investments in the Six Entities, and earned commissions from the entities for the investments they sold.  None of them were registered brokers, nor were they associated with a registered broker, at the time that they were selling the Six Entities' offerings.  Martin and EFS, Hanson, and Ostertag are the highest paid brokers and agents, earning commissions of at least $458,000, $281,000 and $414,000,

respectively, from 2016 through the present.

116.   By engaging in the conduct described above, Defendants Martin, Hanson and Ostertag, and each of them, made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any exemptions promulgated pursuant to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

117.   By engaging in the conduct described above, Defendants Martin, Hanson and Ostertag have violated, and unless restrained and enjoined, will continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, preliminarily and permanently enjoining Defendants Thomas, Becker, ESA, QSA, VBC, VFC, Wellington, and Welscorp, and each of them, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

Civil Procedure, preliminarily and permanently enjoining all Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, preliminarily and permanently enjoining Defendants Martin, EFS, Hanson, and Ostertag, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

## V.

Enter conduct-based injunctions against Thomas and Becker, preliminarily and permanently enjoining each from directly or indirectly, including but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own personal accounts.

## VI.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## VII.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and

the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### IX.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  August 30, 2019

*/s/ Lynn M. Dean*

Lynn M. Dean
Matthew T. Montgomery
Attorney for Plaintiff
Securities and Exchange Commission